# COMPOSITE EXHIBIT "A"

Loan Number: ▮▮▮▮▮▮▮

# ADJUSTABLE RATE NOTE
### LIBOR Six Month Index (as Published in *The Wall Street Journal*)
### Rate Caps - 3 Year Rate Lock

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT.**

| DECEMBER 8, 2004 | MONTEREY PARK | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

1584 VIA BOTERO, OCEANSIDE, CALIFORNIA 92056
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 494,100.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is ALLSTATE LENDING GROUP, INC., A CALIFORNIA CORPORATION (CFL # 01198450) . I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 6.990 %. The interest rate I will pay may change. The interest rate required by this Section 2 and Section 4 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

The interest rate I will pay may change on the 1st day of JANUARY , 2008 , and on that day every 6ᵗʰ month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date in accordance with Section 4 of this Note.

## 3.   PAYMENTS

### (A) Time and Place of Payments

Beginning on the 1st day of FEBRUARY, 2005 , and on the 1st day of every month thereafter until the 1st day of JANUARY, 2008 , I will pay only interest on the unpaid principal balance of the Note. Thereafter, I will pay principal and interest by making payments every month until the Maturity Date, as provided below. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.

My monthly payments will be applied to interest before principal. If, on JANUARY 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2540 CORPORATE PLACE B108, MONTEREY PARK, CALIFORNIA 91754

or at a different place if required by the Note Holder.

### (B) Amount of My Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $2,878.13 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**(D) Withholding**

If I am a non-resident alien, I understand that all payments due hereunder shall be paid without reduction for any taxes, deductions or withholding of any nature. If such tax, deduction or withholding is required by any law to be made from any payment to the Note Holder, I shall continue to pay this Note in accordance with the terms hereof, such that the Note Holder will receive such amount as it would have received had no such tax, deduction or withholding been required.

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the   **1st**   day of   **JANUARY 2008**                  , and on the same day of every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date."

**(B) The Index**

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

At each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **FIVE AND 550/1000**                    percentage points (        **5.550** %) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

> (i) **Interest-Only Period.** The "Interest-Only Period" is the period from the date of this Note through **January 1, 2008**           . For the Interest-Only Period, the Note Holder will calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest      **6.990** %. The result of this calculation will be the amount of my monthly payment until the next Interest Rate Change Date.
>
> (ii) **Amortization Period.** The "Amortization Period" is the period after the Interest-Only Period and continuing until the Maturity Date. During the Amortization Period, after calculating my new interest rate as provided in Section 4(C) above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

**(D) Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than        **8.490** % or less than        **6.990** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE AND 500/1000**                    percentage points (        **1.500** %) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than        **13.990** % nor less than        **6.990** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note and to pay the interest then accruing at the Note rate as of the date my prepayments are applied. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000        % or $143.91           , whichever is greater of my overdue monthly payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**CAUTION**

**IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
CHARLES A. DEFAZIO        -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

*[Sign Original Only]*

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amount owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor, and further waive all relief under any valuation and appraisement laws.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  GOVERNING LAW - SECURED NOTE

This Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan Number: ███████████

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **8th** day of **DECEMBER 2004** and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to **ALLSTATE LENDING GROUP, INC., A CALIFORNIA CORPORATION** (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

## 5.   BORROWERS RIGHT TO PREPAY

I have the right to make prepayments of principal any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.

If within **3** year(s) from the date of execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____          _____
CHARLES A. DEFAZIO

_____          _____

_____          _____

**NCMC GENERIC PREPAYMENT RIDER**
**RE 103  REVISED (020800)**                            ███████████████

Re103.ncm

# ALLONGE TO NOTE

LOAN # ████████

ALLONGE TO NOTE DATED DECEMBER 8, 2004

IN FAVOR OF ALLSTATE LENDING GROUP, INC., A CALIFORNIA
CORPORATION

AND EXECUTED BY
CHARLES A. DEFAZIO

PAY TO THE ORDER OF    NEW CENTURY MORTGAGE CORP.

WITHOUT RECOURSE
ALLSTATE LENDING GROUP, INC., A CALIFORNIA CORPORATION

By: _____
Michael K. Kronsburg

TITLE:  CEO

Pay to the order of, without recourse

New Century Mortgage Corporation
By: _____
Name: Magda Villanueva
Title: A.V.P. / Shipping Manager

DOC #    2004-1192036

Recording Requested By:
ALLSTATE LENDING GROUP, INC.

**Lender Service - PLD**
Fidelity National Financial

And After Recording Return To:
ALLSTATE LENDING GROUP, INC.
2540 CORPORATE PLACE B108
MONTEREY PARK, CALIFORNIA 91754

DEC 20, 2004    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J SMITH COUNTY RECORDER
FEES    69 00
PAGES    21    DA    1

2004-1192036

1253

[Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  **"Security Instrument"** means this document, which is dated    DECEMBER 8, 2004    , together with all Riders to this document.
(B)  **"Borrower"** is CHARLES A. DEFAZIO A SINGLE MAN

Borrower is the trustor under this Security Instrument.
(C)  **"Lender"** is ALLSTATE LENDING GROUP, INC.

Lender is a CALIFORNIA CORPORATION    organized
and existing under the laws of    CALIFORNIA
Lender's address is 2540 CORPORATE PLACE B108, MONTEREY PARK, CALIFORNIA 91754
Lender is the beneficiary under this Security Instrument.
(D)  **"Trustee"** is LSI TITLE CO
2550 N REDHILL AVE, SANTA ANA, CALIFORNIA 92705

(E)  **"Note"** means the promissory note signed by Borrower and dated    DECEMBER 8, 2004    .
The Note states that Borrower owes Lender FOUR HUNDRED NINETY-FOUR THOUSAND ONE HUNDRED AND 00/100    Dollars (U.S. $ 494,100.00    )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 1, 2035    .
(F)  **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G)  **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3005 1/01                                      Page 1 of 14

**1254**

**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | PREPAYMENT RIDER |

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "Escrow Items" means those items that are described in Section 3.

**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | SAN DIEGO | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

LOT 134 OF RANCHO DEL ORO VILLAGE NO. 2,TRACT 2,3 IN THE CITY OF OCEANSIDE,COUNTY OF SAN DIEGO,STATE OF CALIFORNIA,ACCORDING TO MAP THEREOF NO. 12283,FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY,DECEMBER 15,1988.
A.P.N. #: 161-623-76



**1255**

which currently has the address of  **1584 VIA BOTERO**

                                                                [Street]
**OCEANSIDE**                                    , California  **92056**        ("Property Address"):
                    [City]                                     [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:
**1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may

**1256**

be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the

1257

Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement

*cad*

**1258**

is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or



**1259**

other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

*Cad*

**1260**

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**1261**

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**1262**

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**1263**

**21. Hazardous Substances**.  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**.  Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law.  Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**1264**

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**1265**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
CHARLES A. DEFAZZO          -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

Witness:                    Witness:

_____   _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3005 1/01                    Page 13 of 14

**1266**

———————————————— [Space Below This Line For Acknowledgment] ————————————————

State of California )
) ss.
County of SAN DIEGO )

On *December 10, 2004* before me, *CAROL HILL, NOTARY*

personally appeared CHARLES A. DEFAZIO

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CAROL HILL
COMM. #1340124
Notary Public-California
SAN DIEGO COUNTY
My Comm. Exp. Jan 17, 2006
ESH / ESH

———————————————————
NOTARY SIGNATURE

*CAROL HILL*
———————————————————
(Typed Name of Notary)

NOTARY SEAL

1267

Loan Number: ▇▇▇▇▇▇▇▇

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **8th** day of **DECEMBER 2004** and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to **ALLSTATE LENDING GROUP, INC., A CALIFORNIA CORPORATION** (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

## 5.    BORROWERS RIGHT TO PREPAY

I have the right to make prepayments of principal any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.

If within 3 year(s) from the date of execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____

CHARLES A. DEFAZIO

_____        _____

_____        _____

**NCMC GENERIC PREPAYMENT RIDER**
**RE 103  REVISED (020800)**

**1268**

Loan Number: ▮▮▮▮▮

# ADJUSTABLE RATE RIDER

### LIBOR Six-Month Index (As Published In *The Wall Street Journal*)
### Rate Caps - 3 Year Rate Lock

THIS ADJUSTABLE RATE RIDER is made this 8th day of DECEMBER 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to ALLSTATE LENDING GROUP, INC.

("Lender") of the same date and covering the property described in the Security Instrument and located at:

### 1584 VIA BOTERO, OCEANSIDE, CALIFORNIA 92056
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of 6.990 %. The Note provides for changes in the interest rate and the monthly payments as follows:

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the 1st day of JANUARY 2008 , and on the same day of every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date."
### (B) The Index
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**1269**

**(C) Calculation of Changes**

At each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 550/1000      percentage points (5.550     %) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

(i) **Interest-Only Period.** The "Interest-Only Period" is the period from the date of this Note through JANUARY 1, 2008     . For the Interest-Only Period, the Note Holder will calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest at     6.990 % per annum. The result of this calculation will be the amount of my monthly payment until the Interest Rate Change Date.

(ii) **Amortization Period.** The "Amortization Period" is the period after the Interest-Only Period and continuing until the Maturity Date. During the Amortization Period, after calculating my new interest rate as provided in Section 4(C) above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

**(D) Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.490 % or less than     6.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 500/1000 percentage points ( 1.500     %) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than     13.990 % nor less than     6.990 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 11. GOVERNING LAW - SECURED NOTE

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

**3/27 SIX MONTH LIBOR ADJUSTABLE RATE RIDER**
**RE-411  11/18/03**        **Page 2 of 3**

**1270**

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
CHARLES A. DEFAZIO          -Borrower                                             -Borrower


_____ (Seal)          _____ (Seal)
                                   -Borrower                                             -Borrower


_____ (Seal)          _____ (Seal)
                                   -Borrower                                             -Borrower


*[Sign Original Only]*

**3/27 SIX MONTH LIBOR ADJUSTABLE RATE RIDER**
RE-411  11/18/03                                    **Page 3 of 3**

**1271**

Loan Number: ██████████

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **8th** day of **DECEMBER, 2004** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **ALLSTATE LENDING GROUP, INC., A CALIFORNIA CORPORATION** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**1584 VIA BOTERO, OCEANSIDE, CALIFORNIA 92056**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

**COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD**

(the "Declaration"). The Property is a part of a planned unit development known as

**RANCHO DEL ORO**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

**1272**

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                         Page 2 of 3    *Cad*

**1273**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)  _____ (Seal)
CHARLES A. DEFAZIO -Borrower          -Borrower


_____ (Seal)  _____ (Seal)
          -Borrower          -Borrower


_____ (Seal)  _____ (Seal)
          -Borrower          -Borrower

Order No. ███████████

### EXHIBIT "ONE"

Lot 134 of Rancho Del Oro Village No. 2, Tract 2, 3 in the City of Oceanside, County of San Diego, State of California, according to map thereof No. 12283, filed in the office of the County Recorder of San Diego County, December 15, 1988.

Assessor's Parcel No: 161-623-76

2



PLEASE COMPLETE THIS INFORMATION.

RECORDING REQUESTED BY:
    CHS

AND WHEN RECORDED MAIL TO:
Ocwen Loan Servicing, LLC
1661 Worthington Rd #100
West Palm Beach, FL 33409

DOC # 2012-0583268

SEP 26, 2012    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
Ernest J. Dronenburg, Jr., COUNTY RECORDER
FEES:    25.00

2699

DA:    1
**PAGES:**    **3**

_____
*THIS SPACE FOR RECORDERS USE ONLY*

Corrective Assignment of Deed of Trust

(Please fill in document title(s) on this line)

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional recording fee applies)

RECORDING REQUESTED BY:
**HALL SERVICE**

Prepared by: Nadine Alvarez
When Recorded Mail To:
Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, Florida, 33409
Phone Number: 561-682-8835

**2700**

### CORRECTIVE ASSIGNMENT OF DEED OF TRUST
### CALIFORNIA
**"THE PURPOSE OF THIS ASSIGNMENT IS TO CORRECT THE ASSIGNEE NAME ON ASSIGNMENT RECORDED ON APRIL 01, 2009, AS INSTRUMENT # 2009-0161139."**

This ASSIGNMENT OF DEED OF TRUST from NEW CENTURY MORTGAGE CORPORATION, whose address is c/o Ocwen Loan Servicing, LLC. 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409 ("Assignor") to U.S. BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR ASSET BACKED SECURITIES CORPORATION HOME EQUITY TRUST, SERIES 2005-HE2, ASSET BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-HE2, whose address is c/o Ocwen Loan Servicing, LLC. 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409 ("Assignee").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor does by these presents hereby grant, bargain, sell, transfer and set over unto the Assignee, its successors, transferees and assigns forever, in trust, all of the right, title and interest of said Assignor in and to the following deed of trust describing land therein, duly recorded in the Office of the County Recorder of SAN DIEGO County, State of CALIFORNIA, as follows;

Trustor: CHARLES A. DEFAZIO
Trustee: LSI TITLE CO
Beneficiary: ALLSTATE LENDING GROUP, INC.
Document Date: DECEMBER 08, 2004
Amount: $ 494,100.00
Date Recorded: DECEMBER 20, 2004
Page Number: 1253          Document/Instrument/Entry Number: 2004-1192036
Property Address: 1584 VIA BOTERO, OCEANSIDE, CA
*Property more particularly described in the above referenced recorded Deed of Trust*
This Assignment is made without recourse, representation or warranty.
DATED: SEPTEMBER 05, 2012.
NEW CENTURY MORTGAGE CORPORATION
BY ITS ATTORNEY IN FACT
OCWEN LOAN SERVICING, LLC.

BY: _____
NAME: Leticia N. Arias
TITLE: Contract Manager
Power of Attorney Recorded: SEPTEMBER 23, 2005
Instrument No: 2005-0823233

State of FLORIDA
County of PALM BEACH
On SEPTEMBER 05, 2012, before me, _____ personally appeared Leticia N. Arias personally known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of Florida that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature of Notary     Jami Dorobiala

NOTARY PUBLIC-STATE OF FLORIDA
Jami Dorobiala
Commission # DD878994
Expires. APR. 08, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

DOC # 2009-0161139

Recording requested by:

When recorded mail to:

Saxon Mortgage Services, Inc.
4708 Mercantile Drive North
Ft. Worth, TX 76137

APR 01, 2009     8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES          11 00
                        DA·         1

**PAGES:      1**

5359

Order No.:        Ln No.      SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to

**U.S. Bank National Association, as Trustee for Asset Backed Securities Corporation Home Equity Loan Trust, Series 2005-HE2 by Saxon Mortgage Services, Inc. as Attorney in Fact**

All beneficial interest under that certain Deed of Trust dated **12/8/2004** executed by **CHARLES A. DEFAZIO A SINGLE MAN**, as Trustor(s) to **LSI TITLE CO**, as Trustee and recorded as Instrument No. **2004-1192036**, on **12/20/2004** , in Book **xxx**, Page **xxx** of Official Records, in the office of the County Recorder of **SAN DIEGO** County, **CA** together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated: 1/27/2009 6:36 PM

**NEW CENTURY MORTGAGE CORPORATION BY SAXON MORTGAGE SERVICES, INC. F/K/A MERITECH MORTGAGE SERVICES, INC. ITS ATTORNEY-IN-FACT**

By: _Valerie R. Clark_    **Authorized Signatory**

State of TX
County of Tarrant

On 3/9/09 before me, _Angelo Dupon Mayfield_ a notary public ,personally appeared **Valerie R. Clark** , who proved to me on the basis of ~~satisfactory evidence~~ to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

*is personally known to me*

WITNESS my hand and official seal.

Signature _____ (Seal)


ANGELO DUPON MAYFIELD
Notary Public, State of Texas
My Commission Expires
October 10, 2012

**5399**

RECORDING REQUESTED BY:
*Allstate Lending Group, Inc.*
*New Century Mortgage Corp.*

When Recorded Mail To:
New Century Mortgage Corp.
210 Commerce
Irvine, CA 92602
Attn: Cristina Salas

DOC # 2006-0413249

JUN 12, 2006   11:19 AM

OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES    15.00
PAGES      3      DA      1

**2006-0413249**

Order No.
Escrow No.
Loan No. ▮▮▮▮▮▮▮

NCM LN ▮▮▮▮▮▮▮

—— SPACE ABOVE THIS LINE FOR RECORDER'S USE ——

## Corporation Assignment of Deed of Trust

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to NEW CENTURY MORTGAGE CORPORATION, 18400 VON KARMAN, SUITE 1000, IRVINE, CALIFORNIA 92612

all beneficial interest under that certain Deed of Trust dated DECEMBER 8, 2004    executed by CHARLES A. DEFAZIO A SINGLE MAN

, Trustor,

to LSI TITLE CO

, Trustee,

and recorded as Instrument No. 20041192036 on   12/20/04    in book   ,
page             , of Official Records in the County Recorder's office of SAN DIEGO
County, CALIFORNIA           , describing land therein as:
LOT 134 OF RANCHO DEL ORO VILLAGE NO. 2,TRACT 2,3 IN THE CITY
OF OCEANSIDE,COUNTY OF SAN DIEGO,STATE OF CALIFORNIA,ACCORDING
TO MAP THEREOF NO. 12283,FILED IN THE OFFICE OF THE COUNTY
RECORDER OF SAN DIEGO COUNTY,DECEMBER 15,1988.
A.P.N. #: 161-623-76

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

CALIFORNIA CORPORATION ASSIGNMENT OF DEED OF TRUST
11/26/03                                    Page 1 of 2

DocMagic *eForms* 800-649-1362
www.docmagic.com

Ca.aod.1.tem

**5400**

NCM LN# ▮▮▮▮▮▮

| | |
|---|---|
| STATE OF CALIFORNIA          SS.<br>COUNTY OF ~~SAN DIEGO~~ *LOS ANGELES*<br><br>On 12/15/04                                      before me,<br>*Cyndi Artinger*, a notary public<br>personally appeared<br><br>*Michael K. Kronsburg, CFO.*<br><br>personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s), acted, executed the instrument.<br><br>WITNESS my hand and official seal.<br><br>Signature *Cyndi Artinger*<br><br><br>CYNDI ARTINGER<br>COMM. # 1339150<br>NOTARY PUBLIC-CALIFORNIA<br>LOS ANGELES COUNTY<br>COMM. EXP. FEB. 3, 2006<br><br><br>(This area for official notarial seal) | ALLSTATE LENDING GROUP, INC.<br><br><br>Michael K. Kronsburg<br><br><br>CEO |

DocMagic *eFORMS* 800-649-1362<br>www.docmagic.com

Ca.aod.2.tem

3

**5401**

I certify under penalty of perjury that the "Notary Seal" on the document to which this statement is attached reads as follows:

Name of Notary: _____ **CYNDI ARTINGER** _____

Date Commission Expires: _____ **FEB. 3, 2006** _____

Notary Commission Number: _____ **1339150** _____

Manufacturer or Vendor Number: ___ ▉▉▉ _____

County and State Where Bond is Filed: ___ **LOS ANGELES COUNTY, CA** _____

Place of Execution: ___ **IRVINE, CA** _____

Signature: *Malia Elisara*                    Date: 11/19/2005

NCM LN# ▉▉▉

******************************************************************



Investor Loan # ▮▮▮▮▮▮▮

This document was prepared by Ocwen Loan Servicing, LLC

**After Recording Return To:**
Ocwen Loan Servicing, LLC
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838

_____[Space Above This Line For Recording Data]_____

## HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"): Charles Defazio

Lender/Servicer or Agent for Lender/Servicer ("Lender"): Ocwen Loan Servicing, LLC

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 12/08/2004

Loan Number: ▮▮▮▮▮▮▮

Property Address ("Property"): 1584 Via Botero Oceanside, CA 92056-6542

If my representations in Section 1 continue to be true in all material respects, then this Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) The Mortgage on the Property, and (2) The Note secured by the Mortgage. The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, in the real property records of SAN DIEGO County, CA. Said Security Instrument covers the real and personal property described in such Security Instrument (the "Property") located at 1584 Via Botero Oceanside, CA 92056-6542, which real property is more particularly described as follows.

The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents". Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

**(Legal Description – Attached as Exhibit if Recording Agreement)**



This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations.** I certify, represent to Lender and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future

   B. I live in the Property as my principal residence, and the Property has not been condemned

   C. There has been no change in the ownership of the Property since I signed the Loan Documents

   D. I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for a modification of the Loan Documents)

   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct and

   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so and

   G. I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan

   H. If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement

2. **Acknowledgments and Preconditions to Modification.** I understand and acknowledge that:

   A. Time is of the essence under this Agreement

   B. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents and

   C. I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) The Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement

3. **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will

automatically become modified on 09/01/2016 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on 09/01/2016.

A.   The new Maturity Date will be: 02/01/2035.



B.   The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new Principal balance of my Note will be $521,635.77 (the "New Principal Balance"). The "New Principal Balance" may represent the sum of the "Deferred Principal Balance", (if applicable) the "Deferred Principal Reduction" (if applicable) and the "Interest Bearing Principal Balance". I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.   $25,260.77 of the New Principal Balance shall be deferred ("Deferred Principal Balance") and I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, $25,260.77 of the Deferred Principal Balance is eligible for forgiveness ("Deferred Principal Reduction Amount"). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of 06/01/2016, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $496,375.00.

Interest at the rate of 3.12500% will begin to accrue on the Interest Bearing Principal Balance as of 08/01/2016 and the first new monthly payment on the Interest Bearing Principal will be due on 09/01/2016.



My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - Maturity | 3.12500% | 08/01/2016 | $1,812.89 | $513.52, adjusts annually after year 1 | $2,326.41, adjusts annually after year 1 | 09/01/2016 | 222 |



*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

I further understand that, provided I am not in default under the terms of this Agreement and I pay my Note in full (i) Any time more than 30 calendar days after the Modification Effective Date, and (ii) Prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my payoff balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  I agree to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which I am entitled, if applicable, and any other amounts still owed under the Loan Documents by the earliest of: (i) The date I sell or transfer an interest in the Property, (ii) The date I pay the entire Interest Bearing Principal Balance, or (iii) The Maturity Date.

4.  **Additional Agreements.** I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) A borrower or co-borrower is deceased; (ii) The borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce



decree which was recorded, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) The Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. Funds for Escrow Items. I will pay to the Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) Taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) Leasehold payments or ground rents on the Property, if any; (c) Premiums for any and all insurance required by Lender under the Loan Documents; (d) Mortgage insurance premiums in accordance with the Loan Documents; and (e) Any community association dues, fees, and assessments the Lender requires to be escrowed. These items are called "Escrow Items". I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its right under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) Sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) Not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in

Page 5

writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

E.   That this Agreement constitutes notice that the Servicer's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

F.   That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

G.   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H.   That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.   That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Except as noted herein, this Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer or transferee of the Property.

J.   That, as of the Modification Effective Date, any provision in the Note, as amended for the assessment of a penalty for full or partial prepayment of the Note is null and void.

K.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in the first lien position and/or is fully enforceable upon modification and that if, under any circumstances and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title

endorsement(s), title insurance product(s), and/or subordination agreement(s), then the terms of this Agreement will not become effective on Modification Effective Date and the Agreement will be null and void.

L.   That I will execute such other documents as may be reasonably necessary to either (i) Consummate the terms and conditions of this Agreement; or (ii) Correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program. 

M.   Mortgage Electronic Registration Systems, Inc. (MERS) is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In the cases where the loan has been registered with MERS who has only legal title to the interests granted by the Borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage Loan.

N.   That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosures of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) The U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) Any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) Companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) Any HUD certified housing counselor.

O.   That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this section 4.N. shall be referred to as "Documents". I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

P.   That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

## BORROWER ACKNOWLEDGEMENT

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.



7-20-2016
Date

Charles Defazio



## BALLOON PAYMENT DISCLOSURE

Borrower(s) ("I"): Charles Defazio

Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 12/08/2004

Loan Number: ████████

Property Address: 1584 Via Botero Oceanside, CA 92056-6542

THIS BALLOON PAYMENT DISCLOSURE is made this 14 day of Jul, 2016, and is incorporated into and shall be deemed to supplement the Loan Modification Agreement ("Agreement") of the same date given by the undersigned Borrower(s). The Agreement contains a balloon payment provision representing the amount of the Deferred Principal Balance under the Agreement. The Agreement also contains a principal reduction feature that may reduce the Deferred Principal Balance in three equal installments of $8,420.26 in accordance with Section 3(C) of the Agreement, provided that the Borrower remains eligible for principal reduction for the time period specified in Section 3(C) of the Agreement.

A balloon payment is a scheduled lump sum usually due at the end of the mortgage loan term that is significantly larger than the other regularly scheduled periodic payments. This means that even if I make all payments full and on time, the loan will not be paid in full by the final payment date. The amount of the balloon payment may vary depending on my payment history. If my loan is an adjustable rate mortgage, the amount of the balloon payment also may vary based on any interest rate changes that occur during the life of the loan.

If the Borrower remains eligible for the time period specified in the following table, the Deferred Principal Balance will be adjusted to the amounts reflected in the table.

| Duration of Eligibility | Deferred Principal Balance due on Maturity |
| --- | --- |
| 09/01/2016 up to 06/01/2017 | $365,541.24 - NO ADJUSTMENT |
| 06/01/2017 up to 06/01/2018 | $357,120.99 |
| 06/01/2018 up to 06/01/2019 | $348,700.74 |
| 06/01/2019 up to 02/01/2035 | $340,280.47 |

THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS: AN INSTALLMENT OF $340,280.47 WILL BE DUE AND PAYABLE IN FULL ON 02/01/2035, PROVIDED THAT ALL PAYMENTS ARE MADE IN ACCORDANCE WITH THE LOAN TERMS AND THE INTEREST RATE DOES NOT CHANGE FOR THE ENTIRE LOAN TERM. The balloon payment on the loan modification I have applied for is due 222 months from the effective date of the modification.

*Notice required by North Dakota law:*

**CAUTION TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY FOR YOU TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY FOR THIS PURPOSE AND YOU MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN MODIFICATION THAT YOU OBTAIN AT THIS TIME.**

If I cannot pay the balloon payment when due, I may have to obtain a new loan to make the balloon payment or I may lose my property through foreclosure. Before deciding to take this loan, I will consider my ability to pay the balloon payment when it comes due. In addition, the value of the real estate securing this loan may change during the term of the loan. On the date the balloon payment becomes due, the value of the real estate may not be sufficient to secure a new loan in an amount equal to the balloon payment.



NEITHER OCWEN LOAN SERVICING, LLC NOR ANY LENDER TO WHICH THIS LOAN IS TRANSFERRED IS UNDER ANY OBLIGATION TO FINANCE THE AMOUNT OF THE BALLOON PAYMENT.  THEREFORE, I MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS I OWN OR I MAY HAVE TO FIND ANOTHER LENDER TO REFINANCE THE LOAN.

ASSUMING THE OWNER OF MY LOAN OR ANOTHER LENDER REFINANCES THIS LOAN AT MATURITY, I WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN.  I MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

I/we have read the above disclosure and acknowledge receiving a copy by signing below.

**All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below.**

07 , 20 , 2016

_____
Date (MM/DD/YYYY)

Charles Defazio

## LENDER ACKNOWLEDGEMENT
### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

Loan Servicing

_____

Authorized Officer

_____

Date